UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 09/30/2015
```

IN RE: CHINA MEDICAL
TECHNOLOGIES, INC.

No. 12-BR-13736 (REG)

KENNETH M. KRYS, the Foreign
Representative of China Medical
Technologies, Inc.,

                        Appellant,

            v.

No. 15-CV-0167 (RA)

OPINION & ORDER

PAUL, WEISS, RIFKIND, WHARTON, &
GARRISON LLP, and ALIXPARTNERS,
LLP,

                        Appellees.

RONNIE ABRAMS, United States District Judge:

Appellant Kenneth M. Krys appeals from an order of the Bankruptcy Court for the
Southern District of New York (the "Bankruptcy Court") sustaining the claims of attorney-client
privilege and work product protection asserted by Appellees Paul, Weiss, Rifkind, Wharton &
Garrison LLP ("Paul Weiss") and AlixPartners, LLP. For the reasons that follow, the order of the
Bankruptcy Court is reversed.

## BACKGROUND[1]

China Medical Technologies, Inc. (CMED) is a holding company organized under the laws
of the Cayman Islands. In June 2012, the indenture trustee on CMED's notes filed a winding-up

---

[1] In light of the limited scope of the issues on appeal, the Court writes primarily for the parties, and only a
brief overview of the factual and procedural background of this case is provided. As necessary, the Court addresses
any disputed facts in the Discussion, below. All facts in the Background are, unless otherwise noted, drawn from the
Bankruptcy Court's opinion.

petition before the Grand Court of the Cayman Islands seeking CMED's liquidation. The Grand Court granted the indenture trustee's petition, and appointed Appellant as CMED's Cayman Islands Liquidator. *See* Appellant's App. ("AA") 34–46 (the "Winding Up Order"). In October 2012, the Bankruptcy Court recognized the Cayman Islands liquidation proceeding as a foreign main proceeding pursuant to Chapter 15 of the United States Bankruptcy Code. *See* AA 55–58. Appellant acts as CMED's foreign representative (the "Foreign Representative") in the Chapter 15 proceeding.

In this capacity, Appellant sought an order from the Bankruptcy Court authorizing the issuance of subpoenas to Appellees pursuant to Fed. R. Bankr. P. 2004. Specifically, Appellant sought documents and records related to an internal investigation conducted by Appellees, pre-liquidation, on behalf of CMED's audit committee (the "Audit Committee"). The Bankruptcy Court granted Appellant's request, *see* AA 72–74, and Appellees largely complied with the subpoenas, refusing to turn over only those documents that they argue are protected by attorney-client privilege and the work product doctrine (collectively, the "Privileges"). Appellant challenged this withholding, arguing that as CMED's Liquidator, he controlled and thus could waive the Privileges.

In a December 1, 2014 bench decision (the "Opinion"), the Bankruptcy Court ruled, first, that United States law governs the Privileges and, second, that under United States law the Privileges are owned by the Audit Committee and thus did not devolve to the Liquidator. *See* Dkt. 189 ("Op."), 12-BR-13736 (REG) (Bankr. S.D.N.Y. Dec. 1, 2014). Appellant seeks this Court's review of both determinations. In addition to the parties' briefing, the Court heard oral argument in this case on September 17, 2015.

2

Case 1:15-cv-00167-RA   Document 30   Filed 09/30/15   Page 3 of 23

**STANDARD OF REVIEW**

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1). The Court reviews the Bankruptcy Court's findings of fact for clear error and its legal conclusions *de novo*. *Overbaugh v. Household Bank N.A. (In re Overbaugh)*, 559 F.3d 125, 129 (2d Cir. 2009) (per curiam). Mixed questions of law and fact are also subject to *de novo* review. *Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 90 (2d Cir. 2003).

**DISCUSSION**

Appellant raises two issues on appeal. First, he argues that the Bankruptcy Court improperly relied upon United States law—and not that of the Cayman Islands—in determining that the Audit Committee controlled the Privileges and that they thus did not devolve to him in bankruptcy. *See* Br. 15–27. Under Cayman law, he asserts, any privilege that attached to the Audit Committee's communications with Appellees was CMED's privilege, and, in any event, any independent privilege of the Audit Committee devolved to him in bankruptcy. *Id.* 23–27. Second, he argues that he now owns and can thus waive the Privileges even under United States law. *Id.* 27–42.

**I.   Choice of Law**

This appeal raises complicated and difficult choice of law questions, many of which turn on the particular manner in which the issues disputed by the parties are framed. The Bankruptcy Court framed this dispute as determinable solely under the substantive law of privilege and applied the "touch base" doctrine, a federal choice of law rule, to the question of whether United States or Cayman Islands privilege law should govern. *See* Op. 6–12. Finding that United States law should govern, it applied this law to the question of which entity owns the Privileges: CMED or its Audit

3

Committee. *See id.* 12–18. Adopting the reasoning of *In re BCE West, L.P.*, No. M-8-85, 2000 WL 1239117 (S.D.N.Y. Aug. 31, 2000), a case it found to be "closely on point," the Bankruptcy Court determined both that the Audit Committee, a purportedly independent committee authorized by CMED's Board of Directors to retain counsel, owns the Privileges, and that they did not devolve to Appellant, as CMED's Liquidator, in bankruptcy. *See* Op. 12–18.

Appellant asserts that the Bankruptcy Court's choice of law analysis was flawed. His contentions at oral argument diverged from those articulated in his briefing, however. The Court addresses both arguments in turn.

In his briefing, Appellant argues that the Bankruptcy Court misapplied the "touch base" doctrine. *See* Br. 19–23. The Cayman Islands, he contends, is the nation with the "predominant interest" in this proceeding, not the United States, and so its law of privilege should govern. *See id.* He also argues that the Bankruptcy Court erred by framing this case solely in terms of privilege. *See id.* 16–19. Even if United States law controls questions of privilege, he asserts, these questions of privilege turn on underlying issues of corporate law, which should, under the choice of law analysis he argues is proper, be decided pursuant to Cayman law. *See id.*; Reply 3 ("[T]he [internal affairs doctrine] should have governed the 'threshold issues' in this matter even if privilege issues are themselves governed by U.S. law.").

Understanding the precise contours of Appellant's argument in this respect is difficult. Although he does not use this term in his briefing, his theory appears to rely on the concept of *dépeçage*, pursuant to which courts conduct a separate choice of law analysis as to each disputed issue. *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 794 n.8 (2d Cir. 1980). In his briefing, Appellant urges the Court to distinguish the question of which law—United States or Cayman—governs the application of the Privileges from what he asserts is the

4

separate question of which law governs the underlying status of the Audit Committee. *See* Br. 17 ("Even if U.S. law governs application of the Privileges, Cayman law is relevant to, and should control, the underlying substantive issues."). It is this second question that he contends is answerable only "with reference to the legal structure of the entity in question," *id.* 18, and which purportedly turns on two predicate issues, each of which is governed not by the substantive law of privilege, but by the substantive law of corporations: First, is the question of "whether the Audit Committee was separate and distinct from CMED and its Board." *Id.* 16. Second, is the question of what "effect the Cayman Winding Up Order [had] on the internal structures of CMED." *Id.*

To these predicate issues of corporate law, Appellant argues, the Bankruptcy Court should have applied the internal affairs doctrine, *id.* 16–19, a choice of law rule pursuant to which questions regarding the internal affairs of corporations are decided under the substantive law of the place of incorporation. *See, e.g., Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."). Because CMED is incorporated in the Cayman Islands, Appellant asserts that the proper application of the internal affairs doctrine would have required any corporate issues in this proceeding to be decided under Cayman law.

At oral argument, however, Appellant made a different argument. He instead urged a position that is, at least conceptually, far simpler, arguing that this case is determinable solely as a matter of corporate law and need not implicate questions of privilege at all. What the Bankruptcy Court and Appellees frame as issues of privilege, Appellant now argues are exclusively issues of corporate law: the relationship between the Audit Committee and CMED, and whether, under

Cayman law, both pre-liquidation and in bankruptcy, the Audit Committee or CMED's Board of Directors owned the documents produced by Appellees. If Appellant owns the documents under Cayman law, so the argument goes, there is no need to reach the question of privilege in the first place. In framing this case as determinable solely as a matter of corporate law, Appellant now argues that the only choice of law rule the Bankruptcy Court should have applied is the internal affairs doctrine, which he contends points to Cayman law as the rule of decision—not the "touch base" doctrine.

The Court addresses each of Appellant's contentions below, but first outlines those portions of the Bankruptcy Court's Opinion not formally before the Court on appeal, or with which the parties otherwise agree.

## A.     The Unchallenged Portions of the Bankruptcy Court Opinion

Both parties agree that "[t]he Federal Rules of Evidence . . . apply in cases under the" Bankruptcy Code, Fed. R. Bankr. P. 9017, and that they thus apply to this Fed. R. Bankr. P. 2004 proceeding, which arises ancillary to a case filed under Chapter 15 of the Code. The applicable rule of evidence in this proceeding, both parties further agree, is Rule 501, pursuant to which the "common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege. . . . But in a civil case, state law governs privilege regarding a claim . . . for which state law supplies the rule of decision." Fed. R. Evid. 501.

Similarly, neither party challenges the Bankruptcy Court's proper determination that the "common law" for the purposes of a Rule 2004 proceeding, is federal, not state common law. *See* Op. 8. Although state-law rules of decision apply in adversarial proceedings under the Bankruptcy Code, *see In re Gaston & Snow*, 243 F.3d 599, 604–07 (2d Cir. 2001), "an examination under Rule 2004 is nonadversarial in nature [and] aimed at discovering evidence upon which future causes of

6

action may be based." *See In re Asia Global Cross, Ltd.*, 322 B.R. 247, 254 (Bankr. S.D.N.Y. 2005). State law rules of decision are thus inapplicable and federal common law applies instead. *Id.*

The Bankruptcy Court also properly determined that the "common law includes 'choice of law' questions." Op. 8. Although Appellees challenge this determination, *see* Opp. 15 n.4, it is not formally before the Court on appeal. The Court nevertheless briefly addresses their argument that the Bankruptcy Court's choice of law analysis "was actually an unnecessary step," and that it should have applied the substantive privilege law of the United States without engaging in such analysis. *Id.*

As an initial matter, the Bankruptcy Court's determination that the federal common law implicates choice of law questions is well-supported in this Circuit. *See Wultz v. Bank of China Ltd.*, 979 F. Supp. 2d 479, 486 (S.D.N.Y.), *on reconsideration in part*, No. 11 Civ. 1266 (SAS), 2013 WL 6098484 (S.D.N.Y. Nov. 20, 2013); *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 64 (S.D.N.Y. 2010); *In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 0835 (MBM)(DF), 2005 WL 2482494, at *1 (S.D.N.Y. Oct. 7, 2005); *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW)(HBP), 2005 WL 1925656, at *1 (S.D.N.Y. Aug. 11, 2005); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 97 (S.D.N.Y. 2002); *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 519 (S.D.N.Y. 1992); *see also In re Gaston & Snow*, 243 F.3d at 605 ("Our resolution of this question begins with the recognition that federal choice of law rules are a species of federal common law."). This approach is consistent, moreover, with the approach taken in cases where *state* common law provides the rule of decision, in which courts routinely conduct a choice of law analysis. *See, e.g., Condit v. Dunne*, 225 F.R.D. 100, 107 (S.D.N.Y. 2004) ("A federal court sitting

7

in diversity applies the conflict of law rules of the forum state."). There is no reason to think the federal approach should be different.

The particular procedural context in which this dispute arises also lends support to the Bankruptcy Court's decision to conduct a choice of law analysis. "[O]ne of the main purposes of chapter 15 is to assist a foreign representative in the administration of the foreign estate," and Rule 2004 proceedings are one of the mechanisms by which bankruptcy courts provide such assistance. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 347 (Bankr. S.D.N.Y. 2012); *see also* 11 U.S.C. § 1507. In aid of this purpose, "U.S. courts must grant comity and cooperation to the foreign representative." *In re Condor Ins. Ltd.*, 601 F.3d 319, 324 (5th Cir. 2010); *see also* 11 U.S.C. § 1509. Indeed, Chapter 15, which provides for an exception to comity where it "would be manifestly contrary to the public policy of the United States," 11 U.S.C. § 1506, expressly contemplates the application of foreign law. *Compare In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 565 (E.D. Va. 2010) (finding mandatory the extension of comity to foreign law), *with In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012) ("While it is well recognized that comity should be extended in most instances, bankruptcy courts should also have the discretion to deny granting comity to foreign laws.").[2]

The Court finds that the Bankruptcy Court's determination that federal common law includes choice law questions was proper as a matter of law. The Court now turns to Appellant's contentions of legal error, beginning with the Bankruptcy Court's application of the "touch base" doctrine.

---

[2] Although the law is "unsettled when it comes to applying either a federal common law choice of law rule or state choice of law principles in non-diversity cases," *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12 (2d Cir. 1996), and courts are cautioned against applying federal choice of law rules "where no significant federal policy, calling for the imposition of a federal conflicts rule, exists," *In re Gaston & Snow*, 243 F.3d at 607, here, such a policy does exist: Fed. R. Evid. 501, as incorporated into bankruptcy cases by Fed. R. Bankr. P. 9017.

8

## B.    The Applicability of the "Touch Base" Doctrine

In his briefing, Appellant does not challenge the Bankruptcy Court's decision to apply the "touch base" doctrine to questions of privilege, only its actual application of the doctrine, his factual objections to which the Court addresses in Section II.C below. Resolving whether the "touch base" doctrine is the proper choice of law rule to apply to questions of privilege, however, does not address Appellant's contention, raised in briefing, that the status of the Audit Committee—a question he claims is answerable only "by reference to the legal structure" of CMED and its Audit Committee—is a distinct issue for choice of law purposes, and one that requires application of the internal affairs doctrine. *See* Br. 16–19. Nor does it resolve his new contention, raised at oral argument, that the Court need not reach the question of privilege at all and that this case is instead determinable solely as a matter of corporate law.

In any event, both contentions amount to an argument that the dispositive issues in this case are corporate ones, to which the Bankruptcy Court should have applied the internal affairs doctrine—and thus Cayman law.[3] This argument is unpersuasive. It is inconsistent with existing precedent in this district, as well as the Supreme Court's own approach to questions of privilege. The Bankruptcy Court properly determined that the issue of ownership of the Privileges is

---

[3] Under the internal affairs doctrine, were it to apply, Cayman law would provide the rule of decision for any disputes regarding the internal corporate affairs of CMED. And under Cayman law, Appellant contends, any privilege attaching to the Audit Committee's communications with Appellees "would be CMED's privilege, *not the privilege of the Audit Committee or its former members.*" Br. 24–25 (emphasis in original). Upon liquidation, moreover, Cayman law purportedly provides for a company's privileges to devolve to the Liquidator. *Id.* 25–27. In other words, had the Bankruptcy Court conducted the choice of law analysis advocated by Appellant, Cayman law would apply and the privilege asserted by Appellees would be owned—and thus could be waived—by the Liquidator.

Even if Appellant were right that corporate law is dispositive here, it remains unclear whether the internal affairs doctrine would even apply, as it is traditionally a feature of state, not federal, choice of law norms—a rule applied by Federal courts sitting in diversity, but not otherwise. *Compare Lyons v. Rienzi & Sons, Inc.*, 863 F. Supp. 2d 213, 221 (E.D.N.Y. 2012) *on reconsideration in part*, No. 09-CV-4253, 2012 WL 1339442 (E.D.N.Y. Apr. 17, 2012) ("In federal question cases, federal courts generally apply a federal-law—as opposed to a state-law—choice of law analysis to determine which jurisdiction's substantive law is applicable."), *with Klein v. ATP Flight Sch.*, LLP, No. 14-CV-1522, 2014 WL 3013294, at *5 n.3 (E.D.N.Y. July 3, 2014) (noting that "federal courts should not apply federal choice of law rules 'where no significant federal policy, calling for the imposition of a federal conflicts rule, exists.'" (quoting *In re Gaston & Snow*, 243 F.3d at 607)).

governed by the United States law of privilege, and that this case does not implicate issues of corporate law for which a separate choice of law analysis is required.

As an initial matter, at least one court in this district has rejected Appellant's argument that the question of who owns the Privileges is answerable by principles of corporate law, and thus beyond the scope of Fed. R. Evid. 501. *See Fitzpatrick v. Am. Int'l Grp., Inc.*, 272 F.R.D. 100, 104–05 (S.D.N.Y. 2010). In *Fitzpatrick*, plaintiff claimed that his "right of access to privileged corporate communications [did] not involve a privilege issue *per se*, but rather a question of corporate governance, which is controlled by the law of the state of incorporation." *Id.* at 104. He further argued that "Rule 501 covers only the question of whether a privilege exists, and not the related question of who holds the privilege," *id.*—precisely the distinction between issues of privilege and issues of corporate law that Appellant urges the Court to adopt here. The *Fitzpatrick* court concluded, however, that the plain text of Rule 501 suggests it was "intended to address not merely the potential existence of a privilege but the related questions of who holds the privilege, the factual premises for invoking the privilege, whether the privilege may be waived, and, if so, by whom and under what circumstances." *Id.* at 105. Indeed, the court found that "the federal courts have, with some consistency, invoked or implicitly relied on this rule when addressing all of the issues pertinent to the enforceability of a privilege claim—that is, the right to exclude a litigant or other person from access to an assertedly privileged communication—including the asserted entitlement of a litigant to be deemed a party to a privileged relationship." *Id.* (collecting cases). Pursuant to this principle, both the existence and applicability of the privileges asserted— including the questions of who holds and has the power to waive the privilege—are governed by United States privileges law. The Court finds the reasoning of *Fitzpatrick* persuasive.

Appellant's argument is, moreover, inconsistent with the approach taken by the Supreme Court in *Upjohn Co. v. United States*, 449 U.S. 383 (1981) and *CFTC v. Weintraub*, 471 U.S. 343 (1985). Each case sounds generally in the substantive law of privilege, although each also concerns, in part, issues of corporate structure. In *Upjohn*, for instance, the Supreme Court considered the relationship between middle- and lower-level employees of a corporation and its management, *see* 449 U.S. at 389–96, while in *Weintraub*, the Court analogized between the authority of a trustee in bankruptcy and that of a solvent corporation's management, *see* 471 U.S. at 348–49; *infra* Part II. Relevant for purposes of this discussion, however, in neither case did the Supreme Court conduct a choice of law analysis as to which domestic state's corporate law should govern or otherwise undertake any analysis of corporate law as such.

In concluding that the Audit Committee—and not CMED itself—owned the privileges asserted by Appellees, and that these privileges therefore did not devolve to Appellant according to the rule of *Weintraub*, *see* Op. 12–18, the Bankruptcy Court followed the approach to questions of privilege employed by the Supreme Court in *Upjohn* and *Weintraub*. Its Opinion emphasized the capacity of the Audit Committee to retain independent counsel and the expectation, vis-à-vis the principles announced in *Upjohn*, that the Committee's communications with counsel would be sufficiently protected for it to "do [its] job[] without interference." Op. 15–17. It is true that this discussion of the Audit Committee's independence looks to, or at least abuts, issues of corporate law, but no more so than did *Weintraub* and *Upjohn*, neither of which engaged in a choice of law analysis or otherwise treated analogous issues of corporate law as distinct. Instead, as *Weintraub* and *Upjohn* both suggest, and as the court found in *Fitzpatrick*, the doctrine of attorney-client privilege necessarily encompasses adjacent issues of corporate law as part of the functional calculus concerning who and what falls within the scope of its protections.

Because the Bankruptcy Court's discussion of the Privileges properly followed the approach of *Weintraub* and *Upjohn*, Appellant's challenge to the Bankruptcy Court's choice of law analysis fails; any issues of corporate law were within the scope of Fed. R. Evid. 501, and no separate choice of law analysis was thus required. The Bankruptcy Court correctly declined to apply the internal affairs doctrine, as urged by Appellant, and correctly applied the "touch base" doctrine, because the issues at hand are governed exclusively by the law of privilege.[4]

## C.    The Bankruptcy Court's Application of the "Touch Base" Doctrine

As noted, Appellant does not challenge the Bankruptcy Court's decision to apply the "touch base" doctrine to any issues of privilege on which this case might turn. The Court thus need not address this question. It must, however, resolve Appellant's remaining contention that the Bankruptcy Court's application of the "touch base" doctrine rested on clearly erroneous factual determinations. Upon review, the Court finds that the Bankruptcy Court properly determined, under the "touch base" doctrine, that United States law should govern the scope and nature of the Privileges.

---

[4] Contrary to Appellant's assertion, neither the Bankruptcy Court's discussion of the Audit Committee's legal "separateness" nor its analysis of SEC and NASDAQ rules constituted distinct discussions of corporate law. In its Opinion, the Bankruptcy Court expressly recognized that the Audit Committee is not legally separate from CMED's Board of Directors—precisely what Appellant urges this Court to find on appeal. *See* Br. 23. More to the point, it indicated that it would not rely on this consideration in reaching its ownership determination, concluding that the relevant

> issue is not . . . whether the Audit Committee was in fact a committee of the Board. Of course it was; that is the nature of a committee. The issue is rather whether, once formed, the Audit Committee was given independence, and understandably expected, incident to its independence, to engage in its affairs and communicate with its counsel with confidentiality and protection from the scrutiny and interference of others at China Medical, including the Board itself. I think the Audit Committee was, indeed, given that independence.

Op. 14.

That the Bankruptcy Court looked to SEC and NASDAQ rules as part of its ownership determination, *see* Op. 14 n.27, 17, also does not compel a different result. That the Bankruptcy Court looked to these rules is not evidence of it engaging in a corporate law analysis, but instead of it trying to determine—as the Supreme Court did in *Weintraub* and *Upjohn*—the precise scope of the Audit Committee's client relationship with its counsel.

Under the "touch base" doctrine, where "privileged communications took place in a foreign country or involved foreign attorneys or proceedings," courts defer to the "law of the country that has the 'predominant' or 'the most direct and compelling interest' in whether those communications should remain confidential, unless that foreign law is contrary to the public policy of this forum." *Astra Aktiebolag*, 208 F.R.D. at 98 (quoting *Golden Trade*, 143 F.R.D. at 522); *see also Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 117, 119 (S.D.N.Y.), *aff'd*, 982 F. Supp. 2d 260 (S.D.N.Y. 2013) ("In determining which country's law applies to a privilege dispute involving foreign attorney-client communications, courts in this Circuit consider the country with which the communications 'touch base.'" (quoting *Gucci Am.*, 271 F.R.D. at 64–65)). "The jurisdiction with the 'predominant interest' is either 'the place where the allegedly privileged relationship was entered into' or 'the place in which that relationship was centered at the time the communication was sent.'" *Anwar*, 306 F.R.D. at 119 (quoting *Astra Aktiebolag*, 306 F.R.D. at 98).

In determining which jurisdiction has the predominant interest, the Bankruptcy Court found that the "Audit Committee retained Paul Weiss . . . to examine [CMED's] compliance with U.S. securities law under engagement letters governed by U.S. law"; that "[n]one of the activities relating to [Appellees'] engagements had anything to do with the Cayman Islands"; that the "documents said to be protected by the Privileges are located in the U.S."; and that the "allegedly privileged relationship was entered into in the U.S. . . . [and] was centered in the U.S. at the time the communication was sent." Op. 10–11. The Bankruptcy Court recognized that "Cayman has its own interest in consideration of the Privileges because of its underlying liquidation proceeding," but otherwise determined that "the communications or attorney mental impressions underlying the Privileges claims [did not involve] Cayman law in any way." *Id.* at 11. Accordingly, it concluded

13

that the "U.S. has by far the predominant interests" and that United States privilege law therefore governs. *Id.* at 11–12.

Appellant contends that this conclusion rested on factual error. *See* Br. 19–23. He asserts that the "Paul Weiss engagement letter makes no mention of Paul Weiss being retained to examine CMED's compliance with U.S. securities law, nor does it state that the engagement or the investigation is governed by U.S. law." *Id.* 20 (quotations omitted). The Court cannot conclude, however, that this factual finding amounted to clear error. Nor does it find erroneous the Bankruptcy Court's legal conclusion that the United States has the predominant interest in privileges that apply to documents prepared by two United States firms as part of a pre-liquidation investigation. *See* Op. 11–12.

It is true that neither the draft work plan prepared by Paul Weiss for the Audit Committee or its letter of engagement refer to United States securities law. *See* AA 132–39, 140–41. The investigation conducted by Appellees could, moreover, plausibly be framed as internal to the affairs of CMED, a Cayman Islands corporation. But as Appellees note, the anonymous tip that triggered this internal investigation was addressed not only to CMED's auditor in Hong Kong, but to the Securities and Exchange Commission ("SEC")—the relevant United States regulatory authority—and CMED's shares were traded on NASDAQ, a United States exchange. *Id.* 75–76.

Based on these two facts alone, it was not clear error for the Bankruptcy Court to conclude that Appellees' investigation concerned compliance with and potential liability under United States law. *See* Op. 10–12. Having so concluded, the Bankruptcy Court's decision to apply United States law was amply supported by the relevant case law. *See, e.g., Anwar*, 306 F.R.D. at 119 ("American law typically applies to communications concerning 'legal proceedings in the United States' or 'advice regarding American law,' while communications relating to 'foreign legal proceeding[s]

14

or foreign law' are generally governed by foreign privilege law.") (alteration in original) (quoting *Gucci Am.*, 271 F.R.D. at 65).

## II. Application of the Privileges Under U.S. Law

Appellant argues, in the alternative, that even under United States law the Privileges belonged to CMED and are thus waivable by the Liquidator in bankruptcy. *See* Br. 27–42. The Court declines to address the first part of Appellant's argument—the question of who, prebankruptcy, owned the Privileges under United States law—because it finds that they passed to the Liquidator upon bankruptcy pursuant to the reasoning of *Weintraub*. Even if the Audit Committee controlled the Privileges prior to bankruptcy, Appellant, in his role as CMED's Liquidator, has the power to waive them now.

In *Weintraub*, as noted above, the Supreme Court held that a corporation's attorney-client privilege "with respect to prebankruptcy communications" is controlled—and thus waivable—by the trustee of the corporation in bankruptcy. 471 U.S. at 358. Several years earlier, in *Upjohn*, the Supreme Court had clarified the scope of a corporation's attorney-client privilege generally, holding that it protected even communications between low level, non-managerial employees and counsel—at least in the context of investigations directed by corporate management. 449 U.S. at 394–95. The Court explained that such a result was necessary in light of the motivations that justify the doctrine: the need to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice," *id.* at 389, as well as the "the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice," *id.* at 390.

15

The Court in *Weintraub* noted the importance of these underlying justifications, but recognized that rigid adherence to them would, in the case of a bankrupt corporation, "frustrate an important goal" of the Bankruptcy Code:

> In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors. It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct.

471 U.S. at 353–54 (citations omitted).

The issue now before the Court is whether the capacity of the Audit Committee to retain independent counsel and to conduct unfettered internal investigations that implicate corporate management should thwart the statutory obligation of a trustee in bankruptcy to maximize the value of the estate by conducting investigations into a corporation's prebankruptcy affairs. This is not the sort of balancing rejected by the Supreme Court in *Swidler & Berlin v. United States*, 524 U.S. 399, 409 (1998). It is instead a determination as to whether the rationale of *Weintraub* extends to and governs the particular procedural and factual circumstances of this case.

The Bankruptcy Court did not extend the rule of *Weintraub* to the Privileges asserted by the Audit Committee, instead relying on the functional considerations of *Upjohn* to conclude that the Liquidator did not own and could not waive those Privileges. It rightly noted that "one can argue that once any miscreants have left the company, and the fox is no longer guarding the chicken coop, the need for confidentiality no longer exists," but nonetheless concluded that "whether or not miscreants still have the power to interfere with the work of an audit committee," it should

16

follow *BCE West*, in which the court similarly determined that the pre-liquidation privileges of a special committee could not be waived by a trustee in bankruptcy. Op. 17. In *BCE West*, independent counsel to a Special Committee established by the Board of Directors of Boston Chicken challenged subpoenas issued by Boston Chicken's trustee in bankruptcy. 2000 WL 1239117, at *1. As here, the trustee sought documents and records related to a pre-liquidation investigation conducted by counsel on behalf of the Special Committee. *Id.* The court held that the privilege asserted by pre-liquidation counsel belonged to the Special Committee, independent from Boston Chicken's management or its Board of Directors, and thus could not be waived by the trustee. *Id.* at *2–*3. As the Bankruptcy Court itself recognized, however, "*BCE West* did not address" the need for confidentiality after the "miscreants have left." Op. 17. It instead focused on the "separateness" of Boston Chicken's special committee vis-à-vis the Board of Directors, not on the countervailing considerations identified by the Supreme Court as dispositive in *Weintraub*. 2000 WL 1239117, at *2. For this reason, the Court declines to follow *BCE West*.

*Weintraub* did not squarely address the circumstances here. Its analysis was limited to whether privileges asserted by a corporation's counsel were waivable by that corporation's trustee in bankruptcy. The asserted privileges here relate to an investigation by Appellees on behalf of a corporation's audit committee, and the precise relationship between that committee and the corporation is disputed. Despite these factual distinctions, however, the same considerations that weighed in favor of the trustee in *Weintraub* weigh in favor of Appellant here.

In arguing otherwise, Appellees rely, as did the Bankruptcy Court, on a passage from *Weintraub* in which the Court suggested that in the case of an individual, its holding might differ. *See* Opp. 31 n.9 (citing *Weintraub*, 471 U.S. at 356 ("An individual, in contrast, can act for himself; there is no 'management' that controls a solvent individual's attorney-client privilege. If control

17

over that privilege passes to a trustee, it must be under some theory different from the one that we embrace in this case.")). Indeed, as Appellees note, in the *Swidler* case the Supreme Court clarified that an individual's attorney-client privilege survives his or her death. Opp. 32–33 (citing *Swidler*, 524 U.S. at 403–04). They argue that the Audit Committee, given its independence, is more akin to an individual and therefore governed by the rule of *Swidler*, not *Weintraub*. *See* Opp. 33.

It is true that the Audit Committee was "independent" in some sense. It could retain counsel, and it legitimately expected that its communications with counsel would be protected against intrusion by management. But the Audit Committee is not an individual, nor is its status analogous to that of an individual. Instead, it was a committee constituted by CMED's Board of Directors, and thus a critical component of CMED's management infrastructure. The Bankruptcy Court itself found that the Audit Committee was "[o]f course" a "committee of the Board," Op. 14, and Appellees do not seriously contend otherwise. Appellees, moreover, offer no argument as to the continued legal existence of the Audit Committee in bankruptcy, or as to the relevance of any distinction between an independent committee and corporate management once management is deposed in favor of a trustee or liquidator. *See SEC v. Carrillo Huettel LLP*, No. 13 Civ. 1735 (GBD) (JCF), 2015 WL 1610282, at *2–*4 (S.D.N.Y. Apr. 8, 2015) (questioning the applicability of *Swidler* as to defunct corporations, in part because "there is no one who can speak for a defunct corporation in order to assert the privilege," and concluding that "[t]he weight of authority . . . holds that a dissolved or defunct corporation retains no privilege.").

Appellees nevertheless argue that "[i]f not for assurance that the privilege would be maintained," the attorney-client communications elicited during Appellees' investigation "might never have been made." Opp. 30. In its Opinion, the Bankruptcy Court expressed similar concerns:

> Ensuring candid discussions between client employees and counsel
> requires confidence, on the part of each (but especially on the part

18

> of the client employees), that confidential communications will be protected. And that requires predictability. I think I would destroy that predictability if those communicating with counsel in confidential communications would justifiably fear that communications in confidence would not later be protected. . . . Though doing so impedes the Liquidator in his legitimate desire to discover the truth, it is important that company employees talk openly and honestly to the audit committees of the world, and I don't want to do anything that might impede their candor in that regard.

Op. 17–18. These concerns were legitimately raised by respondents in *Weintraub*—and addressed squarely by the Supreme Court in its opinion: "According to respondents, corporate managers will be wary of speaking freely with corporate counsel if their communications might subsequently be disclosed due to bankruptcy. But the chilling effect is no greater here than in the case of a solvent corporation, where individual officers and directors always run the risk that successor management might waive the corporation's attorney-client privilege." 471 U.S. at 357.

Appellees argue that CMED's Board of Directors did not have the authority to waive the Audit Committee's attorney-client privilege, *see* Opp. 23, but this is a distinction without a difference. First, the potential chilling effect on the attorney-client communications of an Audit Committee is no greater than the equivalent effect on communications with corporate counsel that the Supreme Court countenanced in *Weintraub*. Second, the justifications for protected attorney-client communications dissipate in bankruptcy. Prebankruptcy, audit committees "play a critical role in monitoring corporate management and a corporation's auditor." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 403 (S.D.N.Y. 2003). Without the prebankruptcy protection of attorney-client privilege, audit committees could not provide "independent review and oversight of a company's financial reporting processes, internal controls and independent auditors," nor could they offer a "forum separate from management in which auditors and other interested parties [could] candidly discuss concerns." SEC Release No. 8220, "Standards Relating to Listed

19

Company Audit Committees," File No. S7-02-03, 79 SEC Docket 2876, 2003 WL 1833875, at *19 (Apr. 9, 2003). But as the Bankruptcy Court noted in its Opinion, "any miscreants have left the company" in bankruptcy, Op. 17; corporate management is deposed in favor of the trustee, and there is no longer a need to insulate committee-counsel communications from managerial intrusion. Without a legitimate fear of managerial intrusion or retaliation in bankruptcy, Appellees' assertions as to a potential chilling effect ring hollow.

At oral argument, Appellees articulated an additional set of concerns, arguing that a ruling in favor of the Liquidator would make companies less likely to form audit committees or, at the very least, make audit committees less likely to engage independent counsel. Ultimately, however, the Court does not find this argument persuasive. As to Appellees' first concern—that management might be less eager to compose audit committees if the committee's internal documents were later made available to a trustee in bankruptcy—United States securities law ensures that they have little say in the matter. NASDAQ rules require all listed companies to form such committees, *see* NASDAQ Listing Rule 5605-3(2)(A), consistent with Sarbanes-Oxley amendments to the Exchange Act that require an audit committee to have the "authority to engage independent counsel and other advisers, as it determines necessary to carry out its duties," 15 U.S.C. § 78j-1(m)(5).

As to Appellees' second concern, the Court can see no reason why the turnover of attorney-client communications to a trustee or liquidator in bankruptcy would impede the monitoring and oversight functions of a truly independent audit committee, once formed. This concern is valid only if the conflicts of individual committee members prevented an audit committee from discharging its oversight functions. Such conflicts would arise solely if audit committee members were themselves implicated in management wrongdoing. So too in the case of independent counsel or other advisors. Appellees, moreover have not stated concerns that would be specific to an audit

committee, as opposed to the corporation generally. Any chilling of a committee's willingness to perform an internal investigation or retain independent counsel is surely no different in kind than the chilling effects the Supreme Court countenanced in *Weintraub*.

If anything, the prebankruptcy interests of an audit committee are aligned with the interests of a trustee or liquidator in bankruptcy. Insofar as *Weintraub*'s holding is premised on an analogy between the role of the bankruptcy trustee and the prebankruptcy management of a corporation, *see* 471 U.S. at 353, the role of a trustee and an audit committee even more "closely resemble," one another, *id.*, as the facts of this case ably demonstrate. The Winding Up Order issued by the Grand Court of the Cayman Islands, for instance, explicitly grants the Liquidator the authority to "ascertain and conduct investigation into the affairs of the Company," and to take possession of "all books, records and documents of the Company and its accountants, auditors and other advisors or agents." AA 35. As CMED's Liquidator, moreover, Appellant has "asserted control in the Cayman Islands over all of CMED's business records . . . . All of CMED's corporate activities are directed by the Liquidators." *Id.* 48. Appellant's "[c]hief" activity as Liquidator is "an international investigation to recover [CMED's] assets and to discover . . . what happened to the more than $500 million . . . that was paid into the United States bank accounts and then purportedly invested in the CMED Group in recent years." *Id.* Although the parties "differ as to the extent to which the areas of inquiry of the Liquidator's present investigation and [Appellees'] earlier work overlap," Op. 5, these concerns are at the very least related to those identified in the anonymous letter which triggered the investigation led by Appellees.

In light of the Liquidator's allegations that "CMED's creditors and equity holders may have been the victims of a massive multi-year fraud," AA 48, adopting the rule announced by the Bankruptcy Court—and that which Appellees seek to affirm on appeal—would also run counter

21

to the reasoning of *Weintraub*. It would permit the attorney-client privilege to operate "as a shield against the trustee's efforts to identify" corporate assets "wrongfully diverted or appropriated" by a corporation's management and thus "substantially defeat" the Bankruptcy Code's "goal of uncovering insider fraud"—all considerations that the Supreme Court found outweighed any interest in preserving management's control in bankruptcy of a corporation's attorney-client privilege. *Weintraub*, 471 U.S. at 453–54. It would, moreover, upend the Supreme Court's general admonition that the privilege should apply "only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976).

Although the Court recognizes that this is a difficult issue in a largely ill-defined area of the law, it nevertheless respectfully disagrees with the legal determination of the Bankruptcy Court below. The Court finds that Appellant, as CMED's Liquidator, now owns and can thus waive the Audit Committee's attorney-client privilege, regardless of the Committee's prebankruptcy independence. The Bankruptcy Court's ruling to the contrary is hereby reversed.

## III.     Work Product Privilege

The Court's ruling as to attorney-client privilege does not extend, however, to Appellees' assertion of work product protections, which the Bankruptcy Court Opinion only peripherally addressed. *See* Op. 18. Importantly, because "work product protection belongs to the Audit Committee's counsel and cannot be waived by the client," *In re Suprema Specialties, Inc.*, No. 02-10823 (JMP), 2007 WL 1964852, at *5 (Bankr. S.D.N.Y. July 2, 2007), it does not fall within the ambit of *Weintraub*. *See also AP Links, LLC v. Russ*, 299 F.R.D. 7, 12 (E.D.N.Y. 2014) ("Unlike the attorney-client privilege, the work product privilege belongs to the attorney as well as the client, and cannot be waived by the client alone."). Thus, even assuming that the Liquidator owns those documents for which Appellees have asserted work-product protection, he cannot waive this

22

protection unilaterally. Appellant, at the very least, has not cited any cases suggesting otherwise. *See* Br. 34–35 (citing no cases).

## CONCLUSION

For the reasons stated above, the ruling of the Bankruptcy Court is hereby reversed, and this case is remanded for further proceedings consistent with this Court's opinion. The Clerk of Court is respectfully requested to mark this case as closed. In addition, all pending requests for redaction are hereby granted. Redacted versions of any documents that have not yet been filed in this action shall be filed on ECF, with unredacted copies filed under seal.

SO ORDERED.

Dated:      September 30, 2015
            New York, New York

_____
Ronnie Abrams
United States District Judge